Robertson, J.
The sole remedy sought by and allowed to the plaintiffs in this case, seems to have been the right of exclusive employment of the words “ Club House,” to designate their gin, and the defendants were not restrained from using any particular devices accompanying them, or any particular mode of printing, painting, branding or carving them, on any vessels containing them; or any labels or signs, indicating what the commodity was, or where sold. Their offence, if any, therefore, was in using such names to express the commodity sold. They were not prohibited from their use, as a penalty for selling their article as that of the plaintiffs’, because there was no evidence of any oral or written representation, or artifice, used by the defendants to pass their gin off as the plain-' tiffs’, except the title “Club House,” and the charge in the complaint, to that effect, is not sustained, except by that evidence. The color of the labels, and of the letters on them, on the flasks; the color of the boxes, and of the letters on them, are entirely different. The names on the flasks were first blown there by the defendants; they added *225 to the name of the article, both on the flasks and boxes, that of one of the defendants, and prefixed the name “ London,” to the name on the box. There could be no pretence that the most casual and ignorant observer would not discriminate the articles, much less persons who knew what they were going to buy (Crawshay v. Thompson, 4 Man. & Gr. 357; Snowden v. Noah, Hopk. 347; Bell v. Locke, 8 Paige, 75), and, therefore, as I shall presently show, the plaintiffs are not entitled to any relief.
No fraudulent intent in the use of the title “ Club House,” is charged in the complaint, proved by the evidence or found by the court. The decision must, therefore, have rested exclusively on the ground, either that a plaintiff, having made use of a title to designate his wares, no one else has a right to use the same to designate similar wares, or that the subsequent use, by such other person, of such title, is in law or fact a representation that his wares are the same.
There is also no finding by the court, whether the addition of “London,” or the defendants names, was not sufficient to distinguish them, which has been held to be fatal to a claim of the same kind, (Snowden v. Noah; Bell v. Locke, ubi sup.; Perry v. Truefitt, 6 Beav. 73,) and, therefore, I must assume that they were taken as matter of law not to be sufficient. The right of a plaintiff to the exclusive use of a name, of course, can only grow out of the, principle that the subsequent use of it, by another, amounts to a representation that his wares are the same. Of course it will not be contended, that if he has confined its use to a particular commodity, he can prevent it being applied to others of a different kind. Such a copyright in a name would be more extensive and durable than those granted by authority of the Federal Constitution, although its grant by the courts of a state might somewhat trespass upon the exclusive powers of the general government. (Gibbons v. Ogden, 9 Wheat. 1.) Courts have upheld rights to devices, although, as I think, contrary to the spirit and even letter- of that instrument. The origin of the favor *226 shown to trade-marks was the protection of the public, and not merely the individual dealer. The first case containing this doctrine reported, on which all the others seem to depend, is found in a note of Doddridge, J., to the case of Southern v. How, (Popham, 143, and Cro. Jac. 471,) and referred to by Lord Hardwicke, in Blanchard v. Hill, (2 Atk. 484,) and then the action was brought by a purchaser. In Blanchard v. Hill, Lord Hardwicke makes the right of action grow out of the fraudulent design both of putting off an inferior article, and drawing away customers; he possibly may have meant that either was sufficient, and that both were not necessary. The doctrine y^as recognized as law by Lord Mansfield, in Singleton v. Bolton, (3 Doug. 393,) and enforced in Sykes y. Sykes, (3 Barn. & Cr. 541,) and thoroughly sifted and defined in the elaborate and important case of Crawshay v.Thompson, (ubi sup.) In that case, a bold attempt was made to make tbe defendant liable for the use of trademarks, without reference to his intention, but it was thoroughly canvassed and rejected by the entire bench; so that, at common law, an action will not, lie without proof of an intent to deceive, and it is by-no means clearly settled that courts of equity will interfere without some evidence of fraud. They operate by their remedial powers to prevent the continuance of a wrong, and reach the past action of the offender by converting him into a trustee for the injured party; so that, now, even though the article sold with the similated mark be equally good with the genuine, the owner of the latter is entitled to preventive relief, although the public may not have been the sufferer. It seems impossible now to discover the first assumption of this jurisdiction, or its reasons.
Every reported case in a court of equity, however, that I have been able to find, recognizes, as I construe them, 'two principles: First, the necessity of an intent to injure , the originator of the trade-mark, by passing off the wares of the offender as those1 of the former; and secondly, that if ■’ the trade-mark consists of words, they must indicate ownership and origin, and not merely other attributes such as *227 quality, kind, texture, composition, utility, destined use, or class of consumers. The encouragement of this exclusive .use of a word,- not indicating ownership or origin, as a name of any thing, is not a matter of public policy; no great ingenuity or powers of invention are taxed or stimulated thereby. The injury to the public, by the mysterious fascination of far-fetched or high-sounding" names, and strange devices, investing a worthless commodity with the charms of an unknown origin and pompous title is, generally, greater than any benefit to those who first adopt it. It is somewhat singular, that an article only known as the product of a particular person’s skill and labor, and for its excellence as such, rises more slowly in popular favor than those dignified by fanciful names, suggested by a capricious fancy or barbarous taste, and often concealing even baneful compositions, although, when risen, it remains longer stationary. Courts of equity, I think, have not undertaken to sustain any such result by the principles adopted by them, but repudiate any exclusive right to mere epithets.
In almost every one of a series of cases decided by the able Master of the Rolls, Lord Langdale, he repeats the principles regulating the use of words as part of a trademark. Thus parties were restrained by him in Perry v. Truefitt, (ubi sup.,) in the use of a name, from “ attracting custom, which would have otherwise gone to the person first using it.” In Knott v. Morgan, (2 Keen. R. 219,) he stated that the plaintiff could “not have any exclusive property in mere words used as a title,” and held the only question to be, whether the defendant imitated insignia as well as a title. He drew the distinction between the abuse of a name as an instrument of fraud, and its proper use in Croft v. Day, (7 Beav. 74,) and distinctly repudiated any exclusive right to the use of a name. His very words were, “ The right which any person may have to the protection of this court does not depend upon any exclusive.right which he may be supposed to have to a particular name or form of words. His right is to be protected against fraud, and fraud may be practiced by means of a name, though the person practicing it may *228 have a perfect right to use that name, provided he does not I accompany its use with such other circumstances as to effect \a fraud upon others.” In the case of Truefitt v. Perry, in volume 6, id., (p. 73,) the same learned judge exhibited dissatisfaction with Millington v. Fox, (3 Myl. & Cr. 338,) which he seems to have supposed went to the extent of prohibiting the adoption of a mark, by which the goods of another are designated, if it prejudice the trade of the latter, without regard to the intent of such use, or the circumstances accompanying it, which doctrine was repudiated in Crawshay v. Thompson. He remarked, no other case had gone that length; but it will be found, on examination, no such doctrine was sustained in the case of Millingtons. Fox, (ubi sup.) The same doctrine, as to the use of words, is laid down by the learned Vice Chancellor of England, (Sir W. Page Wood,) in The Collins Co. v. Cowen, (3 Kay. & Johns. 428;) in a few lines he expresses the whole law of trade-marks by names : He says, “ There is no such thing as property in a trade-mark as an abstract name. It is the right which a person has to use a certain name for articles which he has manufactured, so that he may prevent another person from using it, because the mark or name denotes that articles so marked were manufactured by a certain person, and no one else can have the right to put the same name .upon his goods, and thus represent them to have been manufactured by the person whose mark it isP This principle will be found not to have been swerved from in any case, whatever additional means may have been adopted to perpetrate a fraud.
The same principle has been adhered to in our own courts. In Partridge v. Menck. (2 Sandf. Ch. 622,) Walworth, Chan., confined the character of the name which was to be a trade-mark, to one “ indicating the manufacture and sale of the article by the party injured, or that he carries on his trade at a particular place. . In the Amoskeag Manufacturing Company v. Separ, (2 Sandf. S. C. R., 599,) the late lamented chief justice of this court, said : “ The owner of a trade-mark has no right to an exclusive use of any words, *229 letters, figures, or symbols, which, have no relation to the origin or ownership of the goods, and are only meant to indicate their quality. He has no right to appropriate a sign or symbol which from the nature of the fact it is meant to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose.” In Fetridge v. Wells, (4 Abb. 14,) the same learned judge in this court, recognizes the same principle, that “ a name can only be protected as a trade-mark when it is used merely as indicating the true origin and ownership of the article.” In Stokes v. Landgraff, (17 Barb. 608,) the Supreme Court of this State held, that no property could be acquired “ in words, marks or devices, which do not denote the goods or property, or particular place of business of aperson." In the case of Burnett v. Phalon, recently decided by Justice Piebbepont, in this court, he holds distinctly, that “ a manufacturer cannot acquire property in words known to the language and in common” use, to designate things or their qualities.” The court, in Thomson v. Winchester, (19 Pick. 214,) went so far as to refuse to prohibit the defendant from using the plaintiff’s own name when it appeared to have come by use to signify an article generally, and not its mere origin or ownership. The doctrine of the Amoskeag Manufacturing Company v. Spear, (ubi sup.,) is fully upheld in this court in the case of Williams v. Johnson, (2 Bos. 1,) and an injunction was refused unless the trade-mark designated the plaintiff’s manufacture. The cases stated, are sufficient to show the strong current of authority, although others might be added.
A host of cases are appealed to as holding an opposite doctrine, all of which, on examination, will be found fully to concede that already laid down. Among these, are Knott v. Mergan, (ubi sup.,) already referred to ; Hine v. Lart, (10 Lond. Jur. 106;) Gout v. Aleplogue, (1 Chit. Gen. Pr. 721, S. C. 6 Beav. 69, n. and 7 Am. Jur. 277;) Perry v. Truefitt, (ubi sup.;) Millington v. Fox, (ubi sup.;) Coffeen v. Brunton, (4 McLean, 517;) Brooklyn Lead Company v. Masury, (25 Barb. 416;) Clement v. Maddicks, (22 Law R. *230 428;) Spottiswood v. Clark, (10 Lond. Jur. 1,048, cited in 2 Sandf. Ch. 628 ;) Christy v. Murphy, (12 How. Pr. 77;) Taylor v. Carpenter, (3 Story, 458, 11 Paige, 292;) Pierce v. Franks, (122 Law J., cited in 2 Sandf. Ch. 600;) Stone v. Carlan, (13 Law R. 360;) and lastly, Howard v. Henriques, (3 Sandf. S. C. 375,) in this court; yet all of these contain distinctive features of their own which sustain the decisions as consistent with the principle already alluded to.
Thus, the word “ Ethiopian,” which was the trade-mark in Hiñe v. Lart, was printed in a curved form, in Egyptian characters, in a particular shade of a dark color, with certain rings of the same color above and below it, upon black stockings. The only difference between the original and imitation was the shade of color. The injunction was given against the use of the device, not the word “ EthiopianP The Turkish word for warranted (Pessendede,) with the initials R. G. above it, a crescent and other devices, being the trade-mark imitated ; in Gout v. Aleplogue, the injunction was against using the device, not the words. An injunction was refused in Perry v. Truefitt, among other things, because every word in “ Medicated Mexican Balm,” which was the trade-mark, was perfectly capable of being applied to a different composition, beside other grounds. The baptismal name of one of the plaintiffs, which was also the first name in their firm, was branded on their iron when sold, as a trade-mark, in Millington v. Fox, (3 Myln & Cr. 338,) and an injunction was granted although the article had, acquired in the trade by long usage, such name as its title, although originally a proper name; in that respect hostile to the case of Thomson v. Winchester, (ubi sup.) The circumstance of the name being that of the plaintiffs, seems to have been overlooked by Lord Langdale, in Truefitt v. Perry, (ubi sup.,) when expressing his dissatisfaction with the case of Millington v. Fox. But costs were refused in that case because the defendant had not been guilty of any intentional wrong.
In Coffeen v. Brunton, (4 McLean, 577,) the names were entirely different, one being the “ Ohio,” and the other the. *231 “Chinese” liniment; but the body of the label and the directions for their use, were printed alike, and other means used to deceive the unwary into the belief they were the same article. The injunction was only against the use of similar labels, nothing being said about the names. These last two cases are cited in Fetridge v. Merchant, (4 Abb. Pr. R. 156,) as authority for a proposition contained in it, which, on a close examination, they will be found not to sustain.
The plaintiff’s own name, with a colorable alteration, was printed in the Brooklyn Lead Company v. Masury. The injunction in Clement v. Maddiclcs, was confined to a colorable imitation of the style of printing the names. In Spottiswood v. Clark, the injunction was dissolved, the use of the same title only being complained of. The plaintiffs own name had been used in Christy v. Murphy. The form or mode of branding, imprinting or using the name, was taken as part of the trade-mark in Taylor v. Carpenter, and Pierce v. Franks. The case of Stone v. Carian, like that of Knott v. Morgan, (ubi sup.,) turned upon the mode of painting the names on the side of carriages.
None of the cases so enumerated, therefore, impugn the doctrine that names haying a definite and established meaning in the language, which do not indicate ownership or origin, or something equivalent, cannot be appropriated by one so as to exclude a similar use by others. They also steer clear of the principle adopted in Burnett v. Phalon, which was that letters, like other devices, may be combined to form a trade-mark even although they form a pronounceable word; provided they do not form a word indicating in its ordinary sense, an attribute of the article not equivalent to ownership or origin. With that limitation, the proposition in Fetridge v. Merchant, (ubi sup.,) that a name may be given “to an article or compound, every ingredient or portion of which is open to the use of every one, but the sale of which, under that appellation, is not lawful to any other person but the giver,” is sound; otherwise, the doctrine of that case is directly opposed to *232 the case immediately preceding it, in the same hook, Fetridge v. Wells, (4 Abb. 14,) which has been already quoted.
The only remaining case to be examined, if it be a case of trade-mark at all, is that of Howard v. Henriques, (3 Sandf. S. C. 725,) in this court. In that case the plaintiff had for a long time kept an inn in high repute, called The Irving Hotel. The defendant started a rival establishment with the same name. In that case the name used did not designate any attribute of the hotel; it did not intimate that it was better or worse, in a good or bad situation, frequented by respectable people or suspected characters, well or ill kept, much or little frequented, cheap or dear; it might have been either under the same name. It would seem, also, that the defendant employed the name to entice customers to his house, as being that of the plaintiff, and made it an instrument of deceit. It was not even laid down in that case generally, that the adoption of a name for a hotel, excluded all others from adopting the same name. Such a principle would be a blow to giving charitable and other institutions, even municipal towns and private individuals, names borne by others, for fear of interfering with their business. Such a privilege cannot be acquired at common law as a copyright; it could hardly be acquired in equity by an injunction against invaders. If it could, the name of everything in the language might be appropriated so as to deter every one from using an epithet for his wares, lest he should be invading some prior right. The energetic, fair and open competition of commerce, should not be so cramped, or the novel but dull use of a name, be confounded with the hard-earned reputation of the wares themselves if sold, known and distinguished, by the name of the maker or dealer.
The term “ Club House,” does not indicate ownership or origin, and does signify some other attribute as quality or kind as distinguished by the nature of the place of its consumption or class of consumers. The title was suggested, as the plaintiffs themselves allege, by the existence in the *233 city where the article was manufactured, of associations called clubs, whose places of meeting were termed “ Club Houses,” where the best articles of the kind were really, or believed to be, consumed; and it was undoubtedly adopted to indicate a high • degree of excellence. The evidence in this case shows the constant use, for a quarter of a century, of these words, to indicate a superior quality including the article in question, (gin,) being in fact the natural result of the high standard required in such institutions. It meant no more than Royal, Imperial or Princely, would do.
The general rule is against appropriating mere words as a trade-mark. The exception is of those indicating ownership f or origin, having no reference to quality or use. The words ! in question come directly within the definition in Amoskeag Manufacturing Company v. Spear, before cited. They are but “ a symbol which, from the nature of the fact they are used to signify, others might employ with equal truth, and . therefore have an equal right to employ for the same purpose,” and no better test could be used. Can any one say they have no idea of the character claimed for the gin by the use of the words in question; and they only imagine them to express that it was made by some particular person ? The moment the straight forward and simple mode of indicating ownership by the owner’s name is abandoned, j the burden is thrown upon the complaining party of show-U ing that the designation used, does not mean something( relating to the quality of the article or some other attribute.
A title indicating anything untrue in the composition of a commodity, cannot be protected as a trade-mark, Fetridge v. Wells, (4 Abb. Pr. R. 144.) The title in this case would be untrue if intended to indicate origin, and would only be justifiable as indicating quality. One of the findings in this case is, that the name employed, did not indicate origin or ownership, without initials or names. As the use of the name was not found as a question of fact, to be with bad intent, it must have been innocent; and at least no costs or damages should be allowed against the defend *234 ants under the decision of Millington v. Fox, (ubi supra.) The plaintiffs, however, seem to base their claim somewhat on the grant to them of the use of the trade-mark by their assignor, and the contract of the latter with the distillers in Holland. Neither the Rotterdam manufacturers hor Mr. Campbell, of course, could grant any rights they could not acquire themselves; and neither of them could alter the meaning or efficacy of the word “ Club House.” The use of the term might be equally innocent, or equally a medium of imposition, no matter by how many persons in succession it might have been used. Were it a mere question of priority of use, the length of time, openness and continuity of that, might have some bearing upon it. 'But it is doubtful ; if the right of using a mere trade-mark, by itself, can be , transferred like a copyright, so as to make wares not yet in existence, the subject of them, and the injury to an assignee of it, greater or less by the use of it by others. The imitation of a trade-mark is entirely a personal injury; it is merely passing off the wares of the imitator as being those ■ of the party injured. I do not see how his borrowing or purchasing the supposed right to use a certain mark to ' designate his wares, can make the offense greater or less. Still less do I see how the relinquishment by the assignor, ~7 of his „ trade-mark, and the dealing in particular wares, I although in favor of a certain person, can prevent the rest of the world from using that trade-mark .to distinguish their wares. On the other hand, although a name has been used" by any one as a trade-mark, and is susceptible of being lised as such, its. previous employment by him, when abandoned, does not prevent any one else from employing it to designate their wares. It is wholly immaterial how long or how much a word has been employed as a trademark. The employer of it, can neither give any special right to another, nor abandon it to the community so as forever to take away the right of employing it to designate \ his wares. If he can, the first use of a trade-mark gives a \ common law perpetual copyright in it. If that exist in this case, it must be in the tradesmen in London and Dublin, *235 who applied the term “ Olub House,” to superior articles, and particularly to those who applied it to gin, as testified to by the witnesses.
But the question arises, what do the plaintiffs intend by “ Olub House?” If it means only gin manufactured by the distillers at Rotterdam, then it includes all they make; and they may equally give the right of using the trade-mark to any one. If it means all they make of the kind imported by Mr. Campbell, then he must join in the permission to use it; or if it means that imported by the plaintiffs, they must create it as their own trade-mark, and then it is proved to have been a designation well known for twenty years.
But if “ Club House” could be and was the plaintiffs’ trade-mark, the defendants seem to have used every precaution to prevent their commodities from being confounded. The differences already pointed out in the vessels in which they were sold, and the additions to the title were amply sufficienf'under the authority of the cases cited. Had the question been submitted to a jury which was submitted in Crawshay v. Thompson, (ubi sup.), there can be no doubt-what the result would have been.
Moreover, the defendants’ wares are intended for, shipped to and circulate in the California market alone, where only recently the plaintiffs have followed them. Of course, the latter cannot claim their trade-mark to be prior in time, there; they have not monopolized all the markets in the world, and cannot exclude the defendants there.
I may remark, also, that the trade-mark as claimed, differs considerably from that proved. They now limit it to an appellation, without any signs or letters to represent the sound or the idea conveyed. Such signs or letters, if used, may become part of the trade-mark when combined with others; but in such case, the sound they represent, or the sense they convey, ceases to be part of it.
For these reasons, I think the judgment erroneous, and it should be reversed, and a new trial had with costs to abide the event.
*236 Pierrepont, J., concurred in reversing the judgment, and it was ordered accordingly.